Dusan **KRATKY**, Appellant,

v.

Jan J. **MUSIL**, Respondent.

No. WD 54340.

Missouri Court of Appeals,
Western District.

June 23, 1998.

John E. Curran, Julie J. McNitt, Curran and Clifford, Osage Beach, for appellant.

W. Gary Drover, Camdenton, for respondent.

Before LAURA DENVIR STITH, P.J., and HANNA and RIEDERER, JJ.

LAURA DENVIR STITH, Presiding Judge.

Dusan Kratky sued his longtime friend, Jan Musil, for fraud connected with Mr. Musil's purchase, at a foreclosure sale, of property previously owned by the two jointly. Mr. Kratky alleged that Mr. Musil had represented, until twenty-four hours before the sale, that they would purchase the property together at the foreclosure sale, and that he had relied on these misrepresentations to his detriment, resulting in his loss of the property. The case was tried to the court. The court entered judgment for defendant Musil,

finding that Mr. Kratky had failed to prove Mr. Musil knew his representations were false and intended Mr. Kratky to rely on them, and that he failed to prove that he had a right to rely on these representations.

Mr. Kratky appeals, alleging that the trial court's ruling is not supported by substantial evidence in that the evidence only supported the conclusion that he had a right to rely on Mr. Musil's representations because he had a confidential relationship with Mr. Musil. Because we find that substantial evidence supported the trial court's determinations on all three issues, and because we find that Mr. Kratky failed to either plead or prove a confidential relationship existed at the relevant time, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Dusan Kratky and Jan Musil have known each other since 1969. In March 1976, Mr. Musil and a cousin of Mr. Kratky, Miloslav Svec, bought 440 acres of real estate in Missouri from Phillip Banks, Jr. and William F. Lawless under a long-term land contract. In May 1976, Mr. Kratky bought one-half of Mr. Svec's one-half interest in the property; he thus had a one-quarter interest in the property. In April 1978, Mr. Kratky bought Mr. Svec's remaining interest in the property, leaving Mr. Kratky and Mr. Musil each owning a one-half interest. In 1981, Mr. Banks and his wife Marjorie, by power of attorney, conveyed this property by warranty deed to Mr. Kratky and Mr. Musil in exchange for a promissory note for $96,500.00, signed by both Mr. Kratky and Mr. Musil, and a deed of trust. Payments were to be made at General Acceptance Company at Eldon, Missouri in monthly installments of $1,050.00.

In October 1989, Mr. Kratky executed a quit claim deed to one-half of the property to Mr. Musil. In exchange, Mr. Musil executed a quit claim deed to the other one-half of the property to Mr. Kratky and his wife. As a result, each fully owned one-half of the property rather than having a one-half interest in the whole property. The parties apparently did not alter their payment arrangements with Mr. Banks; thus, both were still liable on the promissory note as to the entire amount due on the property as a whole. The parties' customary payment practice was for each to separately pay one-half of the monthly amount due. They both often sent in late payments over the years and had received twenty to thirty notices from General Acceptance, on behalf of the lender, concerning these unpaid installments. General Acceptance had never refused a late payment, however.

In November 1989, Mr. Musil, Mr. Musil's girlfriend, Mr. Kratky and Mrs. Kratky were in a serious car wreck. Mr. Musil's girlfriend died. Mr. Musil and Mrs. Kratky were both seriously injured and hospitalized for an extended period of time. Mr. Kratky brought suit against Mr. Musil concerning the car accident. According to Mr. Musil, Mr. Kratky tried to convince him that he was responsible for the accident and, thus, for his girlfriend's death. Mr. Musil thereafter decided these allegations were untrue, and that Mr. Kratky had made them only in order to get money from him in the lawsuit. At that point, Mr. Musil stopped speaking to Mr. Kratky. They thereafter communicated only through Mrs. Kratky, and, as the trial court noted, "[a]fter receiving the acceleration notice and prior to the foreclosure sale, Defendant Musil had advised Plaintiff Kratky's wife that he wanted nothing more to do with them."

As a result of Mr. Musil's hospitalization, Mr. Banks told Mr. Musil that they did not have to pay on the note while he was in the hospital. Mr. Musil nonetheless made his one-half of the payments for December 1989 and January 1990; Mr. Kratky did not. Mr. Kratky made his one-half of the payments for February and March, 1990; Mr. Musil did not. Neither party paid anything for April, May, June or July, 1990. In July, 1990, General Acceptance Co., through its president Diane Procter, sent a letter to Mr. Kratky and Mr. Musil which stated that:

> This is to put you on notice that it will be necessary for you to begin making payments on a regular, prompt basis, commencing August 10, 1990.

> In addition, it will be necessary that you bring your account current by January 10,

1991. Your account is eight months delinquent, totaling $7,875.00.

Mr. Kratky made his one-half of the August 10, 1990 payment; the check was dated August 12, 1990. Mr. Musil did not make this payment. On August 20, 1990, Diane Proctor therefore sent another letter to the parties on behalf of General Acceptance Co. The letter stated:

Enclosed is a copy of the letter I sent to you on July 19, 1990. As stated in this letter, you were required to begin sending regular payments by August 10, 1990. As of today, we have received only a partial payment, $525.

If the balance of this payment, $525, is not paid within seven days we will commence legal action against you. I can assure you this will be a very costly procedure for you, which you may wish to avoid by complying with the July 19 letter.

If you do not intend to pay or cannot pay and want to deed the property back, or if you are in bankruptcy at this time, please advise.

Mrs. Kratky testified that she called Mr. Musil when she received the August 20, 1990 letter and asked him if he had made his payment. Mr. Musil told her that he had made the payment and that he would straighten this out with Mr. Banks. In fact, however, Mr. Musil had not made his payment, nor did he do so within seven days as required by this letter. Mr. Kratky, who believed that the amount due had been paid, also did not contribute the moneys due within the seven-day period. Mr. Musil later testified that he had talked to Mr. Banks, and had been told he would have to make the payment, but that Mr. Banks had not indicated that the payment must be paid on time. Because his payments were often late and he had previously received several letters demanding payment but which were not acted on, Mr. Musil testified that he did not believe that Mr. Banks would "make [a] big deal of [the payment being] even a month late." Mr. Musil thus did send a check, but it was dated August 30, 1990.

Mr. Banks' office did not accept the late payment this time. On September 6, 1990, Mr. McElyea, an attorney and trustee under the deed of trust, sent the parties a letter which stated:

Enclosed you will find the check you [Mr. Musil] sent Phil Banks dated August 30, 1990 for $525.00. I have been contacted by Diane Procter of Mr. Banks' office concerning foreclosure of the Deed of Trust. As you will recall I am named as Trustee on the Deed of Trust and at their request as Trustee have been requested to commence foreclosure proceedings. If you want to try to resolve this matter, my suggestion would be that you contact Diane Procter at General Acceptance Company to discuss how the matter might be resolved.

It is my understanding that the note has been accelerated and the only payments that will be accepted at this point would be a payoff of the note. However, you need to talk to Diane Procter concerning any other possible alternatives.

After receiving this letter, Mrs. Kratky testified that she again called Mr. Musil. She claims that when she asked him what had happened, Mr. Musil "said that he thought that he made the payment on time and for whatever reason now, what we have to do is just pay it off." She also claimed that Mr. Musil said he had the money to pay his portion of the note off. Ms. Kratky testified that she told Mr. Musil that it would take some time for them to raise their portion of the amount needed to pay off the note.

The initial notice of foreclosure sale was sent on September 20, 1990. Mr. Musil planned to pay his one-half of the balance of the note with money his attorney had promised he would receive from a settlement of a lawsuit. Both parties evidently assured the other, at various times, that they thought they had obtained the money they needed, but in each case the hoped-for financing fell through. By October 14, 1990, however, Mr. Kratky had in fact obtained financing for his share of the amount due to pay off the note. Mrs. Kratky testified that she called Mr. Musil and informed him that they had their portion of the money. She claims he told her to set up an appointment with the trustee so

that they could pay off the note. She made this appointment for October 15, 1990, one day before the scheduled foreclosure sale.

On the day of the appointment, Mrs. Kratky called the trustee, who informed her that Mr. Musil had explained that he did not, in fact, have the money to pay off his portion of the note. The Kratkys went to Mr. Musil's house. Mrs. Kratky testified that Mr. Musil told them he did not have the money and that he had previously told them he did because he thought he would have it. When Mr. Kratky asked why he did not let them know that the money had fallen through sooner so that they could try to raise it themselves, Mr. Musil said, "I don't want to talk to you, I don't want to do business with you. Friends don't sue friends, and this is what you get. You have to suffer the consequences."

Mrs. Kratky questioned the trustee about the possibility of paying off one-half of the note to buy their one-half of the property, but Mr. Banks insisted upon full payment. The trustee also informed Mrs. Kratky that if she successfully bid at the foreclosure sale, she would have to pay with a cashier's check. The Kratkys then found another person, Kevin Grace, to assist them in purchasing the property at the foreclosure sale. Mrs. Kratky testified that she called Mr. Musil two times before the sale and that he said he did not have the money. Mr. Musil testified that he tried to get his portion of the money, relying on his settlement money which arrived three days after the foreclosure sale, to pay off the note; however, as it came close to the foreclosure sale, he asked Mr. Banks to again finance the property. Mr. Banks said that he would loan Mr. Musil money, up to the amount currently due on the note, to buy the property at the foreclosure sale, as long as Mr. Kratky, whom Mr. Banks did not like, was not "involved in any which way."

The foreclosure sale took place on October 16, 1990. Mr. Grace bid at the auction for himself and the Kratskys and Mr. Musil bid for himself. At some point in the auction, Mr. Grace apparently questioned Mr. Musil's ability to pay, suggesting he was "bluffing" in order to increase the price. The trustee called Mr. Banks, who told him to accept a personal check from Mr. Musil, because if he bought the property Mr. Banks would be financing it for him. Mr. Musil won the bidding, with a bid of $60,150.00, which was more than the amount due on the note. After deducting the expenses of the foreclosure sale, the Trustee paid Mr. Kratky and Mr. Musil $3,842.09 each for the amount received in excess of that due on the note.

Two days after this sale, Mr. Kratky filed suit in five counts against Mr. Musil and Mr. Banks. Count I alleged fraud and requested compensatory and punitive damages, while Count III alleged fraud and requested the imposition of a constructive trust. Count IV alleged a partnership relationship between Mr. Kratky and Mr. Musil. The remaining counts were dismissed by Mr. Kratky on May 16, 1996. Counts I, III and IV were tried to the court. The court entered a judgment for Mr. Musil and against Mr. Kratky on all three counts, and denied Mr. Kratky's Motion for New Trial. Mr. Kratky now appeals the court's judgment as to Counts I and III.

## II. STANDARD OF REVIEW

In a court-tried case, such as this one, we will affirm the motion court's judgment unless it is against the great weight of the evidence, erroneously declares or applies the law, or there is no substantial evidence to support it. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). The court, as trier of fact, is in a better position than are we to determine the credibility of the witnesses. Accordingly, we defer to its factual determinations, accept as true all evidence and permissible inferences favorable to the judgment, and disregard all contrary evidence and inferences. *Kahn v. Royal Banks of Missouri*, 790 S.W.2d 503, 505 (Mo.App. 1990).

## III. THE COURT DID NOT ERR IN FINDING THAT MR. KRATKY FAILED TO PROVE THE NECESSARY ELEMENTS OF FRAUD

■ As noted, both Counts I and III alleged fraud on the part of Mr. Musil. The elements of fraud are:

(1) a representation;

(2) its falsity;

(3) its materiality;

(4) the speaker's knowledge of the falsity or his ignorance of the truth;

(5) the speaker's intent that his representation should be acted upon by the hearer and in the manner reasonably contemplated;

(6) the hearer's ignorance of the falsity of the representation;

(7) the hearer's reliance on the truth of the representation;

(8) the hearer's right to rely thereon;

(9) the hearer's consequent and proximately caused injury.

*Schauer v. Gundaker Movits Real Estate Co.,* 813 S.W.2d 112, 114 (Mo.App.1991), citing, *Clark v. Olson,* 726 S.W.2d 718, 719 (Mo. banc 1987).

In its judgment, the court below found that Mr. Kratky alleged three fraudulent misrepresentations by Mr. Musil: (1) that Mr. Musil had made the August 10 payment or that it was not necessary to do so; (2) that he had misrepresented that he had one-half of the funds before foreclosure; and (3) that he continued to so misrepresent until 24 hours before the sale. The court found that none of these representations were fraudulent, stating:

> it was not proven that Defendant Musil misrepresented that he had the money or that he waited until 24 hours before the sale to tell Kratky he didn't have the money with the intent that Kratky would be unable to arrange financing and would lose the property.
>
> Non-payment itself is not fraudulent. It must be specifically proven that Defendant did not pay for the purpose of causing the property to go into foreclosure and to not give Plaintiff sufficient time to obtain financing so that Plaintiff would lose his interest in the property. Plaintiff failed to prove this.
>
> Plaintiff has failed to prove that any of the Defendant's actions were done with evil intent and motive and in reckless disregard of Plaintiff's rights.
>
> Wherefore, on count I, the Court finds Plaintiff has failed to prove all elements of

its case and the Count is dismissed with prejudice.

In other words, the court found that Mr. Kratky had failed to prove elements 4, 5 and 8 set out above, for he had failed to show Mr. Musil's knowledge of falsity and intent to deceive, and had failed to show Mr. Musil's right to rely. The Court also rejected Mr. Kratky's claims of fraud in Count III.

On appeal, Mr. Kratky asserts that the evidence did not support the trial court's conclusion that he had no right to rely on the representations of Mr. Musil, and that the record in fact supported the finding of a confidential relationship between the two. When determining whether or not reliance was justifiable, "the courts consider the various circumstances involved, such as the nature of the transaction, the form and materiality of the representation, the relation of the parties, the respective intelligence, experience, age, and mental and physical condition of the parties, and the respective knowledge and means of knowledge of the parties." *Hanson v. Acceptance Finance Co.,* 270 S.W.2d 143, 149 (Mo.App.1954). "The right to rely on a representation is ordinarily a question of fact" for the trier of fact. *Fields v. Mitch Crawford's Holiday Motors,* 908 S.W.2d 877, 880 (Mo.App.1995). We will reverse that determination only if it was not supported by substantial evidence or was against the weight of the evidence.

We need not reach the right to rely issue in determining whether Mr. Kratky should have recovered under his claim for actual fraud, however. Even if we were to assume that Mr. Kratky is correct in asserting that he had a right to rely on Mr. Musil's representations, the court also found that Mr. Kratky had failed to prove that Mr. Musil knew the allegations were false and that he made them with the requisite intent to deceive. Mr. Kratky does not attack these findings on appeal. Since failure to prove any element of a claim for fraud is fatal to the claim, the trial court's finding that Mr. Kratky failed to prove that Mr. Musil knew the allegations were false and that they were made with the requisite intent to deceive requires us to affirm the judgment for Mr.

Musil on Count I's allegations of actual fraud, as well as on Count III to the extent that it also asserts a claim for actual fraud.

## IV. MR. KRATKY NEITHER PLED NOR PROVED CONSTRUCTIVE FRAUD

Perhaps recognizing the weakness of his actual fraud claim, Mr. Kratky also asserts that the parties had a confidential relationship and that as a result he did not have to prove knowledge of falsity or intent to deceive, and that he did prove a right to rely. He further alleges that the court below therefore should have imposed a constructive trust on the property in Mr. Kratky's favor because Mr. Musil breached the confidential relationship between the parties and this resulted in Mr. Musil's unjust enrichment. In short, Mr. Kratky claims constructive fraud based on Mr. Musil's alleged breach of their confidential relationship.

 It is true that "[t]o warrant recovery when a fiduciary or confidential relationship is breached, proof of actual fraud is unnecessary, because the breach of any promise made during that relationship will be considered constructively fraudulent." *Paletta v. Mercantile Bank*, 889 S.W.2d 58, 61 (Mo.App.1994), *citing, White v. Mulvania*, 575 S.W.2d 184, 187, 189 (Mo. banc 1978); *In re Estate of Snyder*, 880 S.W.2d 596, 600 (Mo.App.1994), *citing, Rajanna v. KRR Investments*, 810 S.W.2d 548, 550 (Mo.App. 1991). However, "the existence of a business relationship does not give rise to a fiduciary relationship, nor [to] a presumption of such a relationship." *Chmieleski v. City Products Corp.*, 660 S.W.2d at 275, 294 (Mo.App.1983), *citing, Sewell v. Ladd*, 158 S.W.2d 752, 757 (Mo.App.1942). Rather, to establish a confidential or fiduciary relationship,[1] the following basic elements must be proven:

(1) as between the parties, one must be subservient to the dominant mind and will of the other as a result of age, state of health, illiteracy, mental disability, or ignorance; (2) things of value such as land, monies, a business, or other things of value which are the property of the subservient person must be possessed or managed by the dominant party; (3) there must be a surrender of independence by the subservient party to the dominant party; (4) there must be an automatic or habitual manipulation of the actions of the subservient party by the dominant party; and (5) there must be a showing that the subservient party places a trust and confidence in the dominant party.

*Chmieleski*, 660 S.W.2d at 294.

 Mr. Kratky's pleadings failed to adequately assert constructive fraud. While Rule 55.15 does not require constructive fraud to be pled with particularity, pleading of all facts necessary and essential to the claim is required. *Schauer*, 813 S.W.2d at 115. Mr. Kratky's pleadings fail to meet this standard. In relevant part, Count I asserted that Mr. Musil made representations to Mr. Kratky about use of the funds to pay off the note, and:

That Musil's representation to Plaintiff was false and Defendant knew that the representation was false; further, that this representation by Musil was material to Plaintiff's making of only one-half of the regular note payment.

That Musil made the representation to Plaintiff falsely and fraudulently and for the purpose of causing Plaintiff to not remedy the lack of payment by the Defendant in order to cause the property to be foreclosed under the Deed of Trust; Further that Plaintiff did so rely on the representation by Musil and made only his usual payment.

. . . .

That Musil did not intend to use his funds to pay one-half the remaining balance of the promissory note, but made the representation falsely, fraudulently, and with the intent that Plaintiff rely on his representation and not seek sufficient funds to pay the entire balance remaining due on the promissory note and stop the foreclosure proceedings; Further that Musil's

---

1. "[A] confidential relationship is synonymous with a fiduciary relationship, and extends to instances in which a special confidence is reposed on one side and there is resulting *domination* *and influence* on the other." *Chmieleski v. City Products Corp.*, 660 S.W.2d 275, 293–94 (Mo. App.1983), *quoting, Gibson v. Gibson*, 534 S.W.2d 100, 104 (Mo.App.1976).

representation was material to Plaintiff's actions in seeking adequate funds to pay the promissory note.

That Plaintiff relied upon Musil's representation as intended by Defendant Musil, and did not acquire other funds for payment of the full amount of the promissory note, but obtained only those funds necessary to pay one-half of the promissory note balance, further, that Plaintiff, because of the relationship between Plaintiff and Defendant and the past course of dealing with Musil had the right to rely upon Musil's representations.

. . . .

That all of Musil's actions and representations to the Plaintiff concerning payment of the promissory note and the availability of funds for the payment of the promissory note were false and fraudulent and done with the purpose of inducing the Plaintiff to rely upon Defendant's representations and not secure adequate financing to prevent the foreclosure so that Defendant could purchase the property at the foreclosure sale thereby divesting Plaintiff of his interest in the real property.

Count I then requested relief in the form of actual and punitive damages.

Count III incorporated Count I by reference, and further alleged that Mr. Musil and Mr. Banks "intentionally caused a foreclosure . . . and thereafter made the false and fraudulent misrepresentations set forth hereinabove for the sole and exclusive purpose of preventing Plaintiff from securing financing to protect his interest . . . and thereby divested Plaintiff of his ownership interest in said real property." Rather than requesting damages as had Count I, Count III then requested the court to impose a constructive trust on the property in Mr. Kratky's favor.

■ As is evident, both Counts I and III do plead the elements of actual fraud. Neither Count I nor Count III asserts a claim for constructive fraud, however, for neither asserts that a confidential relationship existed between the parties. Mr. Kratky seems to assume that his request for the imposition of a constructive trust in Count III should be treated as a claim for constructive fraud. A constructive trust is a form of equitable remedy which the courts have authority to grant in cases of both actual and constructive fraud.[2] The mere fact that imposition of a constructive trust is one remedy which the court may grant where constructive fraud (or actual fraud) is proved does not transform a request for a constructive trust into a pleading of constructive fraud, however. If it did, then, by analogy, a request for compensatory damages would be sufficient to plead a claim of negligence, breach of contract, strict liability, etc. As is evident, Mr. Kratky pled only actual fraud in both Count I and Count III and cannot raise a different claim for the first time on appeal.

■ Even were we to interpret Mr. Kratky's claims about the nature of his relationship with Mr. Musil and his reliance on Mr. Musil as a claim of constructive fraud, however, his claim would fail. To establish a confidential relationship and a breach thereof which warrants the imposition of a constructive trust, the allegations must be proven with evidence which is " 'so clear, cogent and convincing as to exclude all doubt from the mind of the court.' " *Paletta, 889 S.W.2d at*

---

2. As our Supreme Court has noted:

"[I]n imposing or declaring a constructive trust a court of equity merely uses the machinery of a trust to prevent fraud or provide a remedy in cases of fraud, actual or constructive, by making the person who has wrongfully acquired property, or has acquired property under such circumstances as make it inequitable for him to retain it, a trustee for the person defrauded or injured by such fraudulent or wrongful conduct. . . .

In most cases (and such seems to be a typical case of a constructive trust) the object and purpose of a court of equity in imposing a constructive trust is 'to restore to plaintiff property of which he has been unjustly deprived and to take from the defendant property the retention of which by him would result in a corresponding unjust enrichment of the defendant; in other words the effect is to prevent a loss to the plaintiff and a corresponding gain to the defendant, and to put each of them in a position in which he was before the defendant acquired the property.' . . . "

*In re Estate of Dawes,* 891 S.W.2d 510, 523 (Mo.App.1994), *quoting, Suhre v. Busch,* 343 Mo. 679, 123 S.W.2d 8, 15–17 (1938), *quoting,* Restatement of Restitution § 160 cmt. d at 643 (1936).

61, quoting, Swon v. Huddleston, 282 S.W.2d 18, 25 (Mo.1955). See also, Neal v. Sparks, 773 S.W.2d 481, 486 (Mo.App.1989) ("an extraordinary degree of proof is required. The evidence must be so clear, cogent, unequivocal and positive as to banish doubt and so convincing that no reasonable doubt can be entertained of its truth.") Under this standard, the trial " 'court should be clearly convinced of the affirmative of the proposition to be proved.' " In re Estate of Dawes, 891 S.W.2d 510, 522 (Mo.App.1994), quoting, Grissum v. Reesman, 505 S.W.2d 81, 85–86 (Mo.1974) (emphasis in original).

Here, Mr. Kratky asserts that he relied on and trusted Mr. Musil in regard to management of the land in question, and that Mr. Musil had a corresponding fiduciary obligation to him. At most, however, Mr. Kratky proved only that in the past Mr. Kratky had relied on the business advice of Mr. Musil and that the two had a long-time friendship. The evidence does not show that Mr. Musil accepted that reliance or encouraged it, that he took advantage of it, or that Mr. Kratky was subservient to him and he dominated Mr. Kratky.

Neal v. Sparks is instructive. Plaintiff in that case made a similar claim that the trial court abused its discretion in failing to impose a constructive trust on land which plaintiff claimed that a Mr. Girdner fraudulently induced him to transfer. In support, Neal asserted that Mr. Girdner was like a father to him, and that Girdner breached this "confidential relationship" by his actions. Mr. Girdner had testified that he did not regard Mr. Neal as a son, that he dealt with him as a business adversary, and that Mr. Neal was always in debt to him and trying to borrow more.

This Court held that the trial court did not err in finding that the relationship and financial dealings between the parties did not create a confidential relationship, stating:

> to prove a confidential or fiduciary relationship it is necessary to show that one party because of age, state of health, illiteracy, mental disability or ignorance has become subservient to the dominant will of another, that the property of the subservient person has come into the possession or management of the dominant person, that the subservient person has surrendered his independence, and that there has been manipulation of the actions of the subservient party who has placed his trust and confidence in the dominant person.

Neal, 773 S.W.2d at 486. We found that Mr. Neal failed to prove or even allege that he was subservient to Mr. Girdner in any way or that he was manipulated by him. Id. at 487. We also noted that even had Mr. Neal proven that Mr. Girdner breached an oral agreement to him, absent such a confidential relationship, or absent actual fraud, this was insufficient for the imposition of a constructive trust. Id.

Like the claimant in Neal, Mr. Kratky has failed to plead or prove that he was subservient to Mr. Musil or manipulated by him. Although Mr. Kratky claimed the parties' long-standing personal and business relationship justified his reliance, a long-term friendship is more indicative of an equal relationship and does not establish a subservient one. Although Mr. Kratky claimed he relied on Mr. Musil's advice, there was no evidence presented that Mr. Kratky was in any way less capable in business matters, or real estate transactions, than Mr. Musil. To the contrary, the evidence showed that Mr. Kratky was a licensed real estate agent. Mr. Kratky's expertise as a real estate agent in this transaction involving a real estate matter also makes any claim that he played a subservient role less plausible. In any event, his complaint is not that he did not understand the transaction; it is that he thought Mr. Musil should have looked out for him and told him that he would not have the money. This begs the question why he should do so. Mr. Musil states he did not undertake this type of obligation to Mr. Kratky and, as noted earlier, the mere fact that the pair had long-time business dealings together does not establish that Mr. Kratky was subservient to Mr. Musil or that a confidential relationship existed. Chmieleski, 660 S.W.2d at 294.

This is particularly true where, as here, the court had before it substantial evidence that the parties' friendship had ended at the time the representations in question were made. Specifically, the record showed that

Mr. Kratky brought suit against Mr. Musil concerning the car accident they were involved in, and made Mr. Musil believe he was responsible for the accident and his girlfriend's death. Mr. Musil then decided these allegations were untrue, and that Mr. Kratky had made them only in order to get money from him in his lawsuit. At that point, Mr. Musil stopped speaking to Mr. Kratky. They thereafter communicated only through Mrs. Kratky, and, as the trial court noted, "[a]fter receiving the acceleration notice and prior to the foreclosure sale, Defendant Musil had advised Plaintiff Kratky's wife that he wanted nothing more to do with them." Moreover, when Mr. Kratky asked Mr. Musil why he did not let the Kratkys know that the money had fallen through sooner so that they could try to raise it themselves, Mr. Musil had said, "I don't want to talk to you, I don't want to do business with you. Friends don't sue friends, and this is what you get. You have to suffer the consequences."

This evidence clearly supported the trial court's findings. It also requires us to find that no confidential relationship existed. Accordingly, the court was justified in denying the request for imposition of a constructive trust, based on a claim of actual fraud, and would have been justified in denying the request for imposition of a constructive trust based on a claim of constructive fraud, had constructive fraud been pleaded.

For all of these reasons, we affirm the judgment below.

HANNA and RIEDERER, JJ., concur.