SUN AVIATION, INC., Respondent,

v.

L-3 COMMUNICATIONS AVIONICS SYSTEMS, INC., Appellant.

No. SC 96280

Supreme Court of Missouri, en banc.

Opinion issued October 31, 2017

Rehearing Denied December 19, 2017

·L-3 was represented by Elizabeth C. Carver and‹ Thomas C. Walsh of Bryan Cave LLP in St. Louis, (314) 259-2000; Edward F. Downey of Bryan Cave LLP in Jefferson City, (573) 556-6622; and Caleb Phillips . of Bryan Cave LLP in ˙Kansas City, (816) 374-3200.

Sun was represented by Michael P. Healy of The Healy Law Firm in Lee's Summit, (816) 472-8800.

Zel M. Fischer, Chief Justice

L-3 Communications Avionics Systems, Inc. ("L-3") appeals the circuit court's judgment in favor of Sun Aviation, Inc. ("Sun") for violations of various provisions of the Merchandising Practices Act, sections ·407.010 .et seq.[1] The circuit court's judgment is reversed in part, and the case is remanded for a new trial on damages. In all other respects, the judgment is affirmed.

### Factual and Procedural History

L-3 is a manufacturer of aircraft instruments. It transacted with Sun to act as a distributor of L-3's products: gyros [2] and power supplies.[3] When L-3's parent company underwent a consolidation ,process, the parent decided to terminate L-3'ś distributorship with Sun, and directed L-3 to do so. Sun filed an action against L-3 raising the following claims: Count I, violation of § 407.405 (the "Franchise Act") by failing to provide timely, written notice of termination; Count II, violation of § 407.753 (the "Industrial Maintenance and Construction Power Equipment Act" or "IMCPE Act") by terminating the parties' business relationship without good cause; Count III, violation of § 407.860 (the "Inventory Repurchase Act") by refusing to repurchase inventory; and Count IV, fraudulent concealment of its parent's consolidation plans, which eventually led to

---

**1.** Statutory citations are to RSMo 2000, unless otherwise noted.

**2.** These gyros are usually inserted into the aircraft's instrument panel. Upon being plugged into a power source to operate, the gyros can calculate and display the aircraft's position. The gyros do not have an internal power source; rather, they must draw power from an external power source to operate.

**3.** Power supplies are installed in an aircraft's instrument panel. They can provide temporary power to the instrument panel˙ in the event of a power failure. They contain approximately six batteries, but must be charged before installation, and are then charged .by the aircraft's battery system.

the termination of the parties' business relationship.

The circuit court granted Sun's motion for partial summary judgment as to liability but not damages on Counts I, II, and III. The circuit court ordered the case to proceed to trial on damages on those counts as well as liability and damages on Count IV. Following a bench trial, the circuit court entered judgment in favor of Sun on Count IV. The circuit court awarded Sun damages on all counts. L-3 appealed, and after opinion by the court of appeals, this Court sustained transfer pursuant to article V, section 10 of the Missouri Constitution.

## I.

L-3 argues the circuit court erred in granting partial summary judgment in favor of Sun on Counts II and III because L-3's products are not "industrial, maintenance and construction power equipment used for industrial, maintenance and construction applications" pursuant to the IMCPE Act, section 407.753, and the Inventory Repurchase Act, section 407.860. "Whether to grant summary judgment is an issue of law that this Court determines *de novo*." *Swadley v. Shelter Mut. Ins. Co.*, 513 S.W.3d 355, 357 (Mo. banc 2017). "Statutory interpretation is an issue of law that this Court reviews *de novo*." *Newsome v. Kansas City, Mo. Sch. Dist.*, 520 S.W.3d 769, 780 (Mo. banc 2017).

The IMCPE Act, section 407.753.1, provides:

Any manufacturer, wholesaler or distributor of **industrial, maintenance and construction power equipment** used for industrial, maintenance and construction applications and repair parts therefor, who enters into a written or parol contract with any person, firm, or corporation engaged in the business of selling and repairing industrial, mainte-

nance and construction power equipment used for industrial, maintenance and construction applications and repair parts therefor, whereby such retailer agrees to maintain a stock of parts or complete or whole machines or attachments, shall not terminate, cancel, or fail to renew any such contract without good cause.

(Emphasis added). The Inventory Repurchase Act, section 407.860.1, provides that a "wholesaler, manufacturer or distributor shall repurchase that inventory previously purchased from him and held by the retailer at the date of termination of the contract." A "retailer" is defined as "any person, firm or corporation engaged in the business of selling, repairing and retailing ... [i]ndustrial, maintenance and construction power equipment[.]" Section 407.850(5)(b) (emphasis added).

The issue is whether the General Assembly intended for gyros and power supplies to be covered under the phrase "industrial, maintenance and construction power equipment." "This Court's primary rule of statutory interpretation is to give effect to legislative intent as reflected in the plain language of the statute at issue." *Parktown Imps. v. Audi of Am.*, 278 S.W.3d 670, 672 (Mo. banc 2009). However, when the General Assembly has not defined the phrase "industrial, maintenance and construction power equipment," "undefined words are given their plain and ordinary meaning as found in the dictionary to ascertain the intent of lawmakers." *Howard v. City of Kansas City*, 332 S.W.3d 772, 780 (Mo. banc 2011). In addition to seeking guidance from the dictionary, "when a statute in question fails to provide a statutory definition, ... case law interpreting the term in the context of the statute" should be considered. *State ex rel. Proctor v. Messina*, 320 S.W.3d 145, 155 (Mo. banc 2010).

■ The circuit court concluded the gyros and power supplies were covered under the IMCPE Act, section 407.753, and the Inventory Repurchase Act, section 407.860. It reasoned:

> The word "power" means "a source or means of supplying energy." Webster's Ninth New Collegiate Dictionary (1989) at 922. The word "equipment" means "the set of articles or physical resources serving to equip a person or thing: as the implements used in an operation or activity." Webster's at 421. The Court finds the ordinary meaning of the term "power equipment" is any article or implement that is a source of energy, supplies energy, or uses energy in an operation or activity. Applying this meaning to the issue at hand, the Court finds that L-3's power supplies and gyros are "power equipment" as the term is used in Section 407.753. This is true if these products are described as batteries, generators, emergency power sources, standalone electric using equipment, or other descriptive names. Accordingly, repair parts for these products fall under the guise of Section 407.753. Additionally, the Court finds it is not disputed these products are used in the avionics industry.

Using this same reasoning, the circuit court found Sun was a "retailer" as defined in § 407.850(5)(b). The circuit court, however, erred in granting partial summary judgment in favor of Sun on Counts II and III.

■ The phrase "power equipment" cannot be read in isolation; the entire phrase "industrial, maintenance and construction power equipment" must be considered. "When determining the legislative intent of a statute, no portion of the statute is read in isolation, but rather the portions are read in context to harmonize all of the statute's provisions." *BASF Corp. v. Dir. of Revenue*, 392 S.W.3d 438, 444 (Mo. banc 2012) (per curiam). "When interpreting a statute, this Court must give meaning to every word or phrase of the legislative enactment." *State ex rel. Jackson v. Dolan*, 398 S.W.3d 472, 479 (Mo. banc 2013). It is not sufficient to determine only whether the gyros and power supplies are "power equipment." The phrase "power equipment" is categorized by the preceding phrase "industrial, maintenance and construction[.]" *Columbia Athletic Club v. Dir. of Revenue*, 961 S.W.2d 806, 809 (Mo. banc 1998), *overruled on other grounds by Wilson's Total Fitness Ctr. v. Dir. of Revenue*, 38 S.W.3d 424 (Mo. banc 2001).

■ This Court has not had occasion to interpret the phrase "industrial, maintenance and construction power equipment." However, the United States District Court for the Eastern District of Missouri, has interpreted the phrase.[4] In *McBud of Missouri, Inc. v. Siemens Energy & Automation, Inc.*, a distributor filed an action against a manufacturer, alleging violations of the IMCPE Act, section 407.753. 68 F.Supp.2d 1076, 1079–80 (E.D. Mo. 1999), *aff'd*, 210 F.3d 379 (8th Cir. 2000). The products at issue "intercept[ed] electric power as it enter[ed] an end user's facility,

---

4. Notwithstanding the well-established principle that this Court is not bound by the decisions of the lower federal courts, *Rodgers v. Danforth*, 486 S.W.2d 258, 259 (Mo. banc 1972), this Court may independently assess such decisions and "look respectfully to such opinions for such aid and guidance as may be found therein[,]" *Hanch v. K. F. C. Nat'l Mgmt. Corp.*, 615 S.W.2d 28, 33 (Mo. banc 1981), especially when a lower federal court has interpreted a Missouri statute before this Court. Of course, any federal court interpretation of a Missouri statute should be consistent with the intent of the General Assembly. *See, e.g., Sours v. State*, 603 S.W.2d 592, 600–01 (Mo. banc 1980).

and distribute[d] and control[led] the power within the end user's facility." *Id.* at 1079. The equipment was "typically used to distribute electrical power through a series of interrelated machines and equipment in order to allow the machines and equipment to work in a coordinated fashion." *Id.*

■ The distributor argued the words "power" and "equipment" could be read in isolation from its companion words "industrial, maintenance and construction," which led to a broader interpretation of the phrase. *Id.* at 1080–81. The federal district court rejected the distributor's argument, explaining:

> [I]t strains common sense to conclude that the Missouri legislature intended the term "power equipment" to include items of equipment or component parts which work in an auxiliary or supplementary manner with other machines or equipment. If [the distributor's] contention were taken to its logical extreme, a distributor of electrical outlets or electrical wiring, whose products were utilized in an industrial, maintenance or construction setting, would fall within the scope of the statute because those are devices which can conduct power to enable machines to perform work. This would be an absurd result, and the Court does not read the statute to permit the construction urged by [the distributor]. Rather, the language of the statute indicates that, at minimum, "power equipment" must refer to end use machines and equipment which operate and perform work using some power source, whether electrical, gas, steam, or other, or their own internal

power source, such as an internal combustion engine.

*Id.* at 1081–82.[5] This Court is persuaded that the federal district court's interpretation of the phrase "industrial, maintenance and construction power equipment," as set out in the IMCPE Act, section 407.753, and the Inventory Repurchase Act, section 407.860, is what was intended by the General Assembly.

Consistent with the federal district court's interpretation in *McBud*, L-3 argues the products are "component parts" that perform in an auxiliary or supplementary manner with other aircraft components, and are not "end-use" machines. This Court agrees the aircraft itself is the end-use machine; the gyros and power supplies, which are installed in the aircraft's instrument panels, are akin to component parts and, in fact, are only two of many component parts. Indeed, the gyros cannot gauge the aircraft's position without the rest of the aircraft, and the sole function of the power supplies is conducting back-up power to the aircraft's instruments.

Nor do these products operate under their own internal power source. Instead, electricity passes through them on its way to another place where it would "enable machines to perform work." *Id.* at 1081. The gyros require an external power source. The power supplies, which contain an internal battery pack, need to be constantly charged before installation and rely on the aircraft's battery system to remain charged during flight. The power supplies only conduct and store power; they do not generate it. It would strain common sense to place the power supplies at issue on

5. The General Assembly had not defined the phrase "industrial, maintenance and construction power equipment" at the time *McBud* was decided in 1999. Indeed, the General Assembly, to this day, has still not provided a definition for the phrase well after the federal district court's interpretation in *McBud*.

equal footing with an internal combustion engine.

If this Court were to assume, *arguendo*, the phrase "industrial, maintenance and construction power equipment" is ambiguous, and, therefore, it was necessary to resort to canons of statutory construction, it would not construe the phrase "industrial ... power equipment" as including all equipment that relates to some industry (as a classification of a business endeavor). The word "industrial"—as used in the IMCPE Act, section 407.753, and the Inventory Repurchase Act, section 407.860— is not synonymous with the word "industry." For example, in *State ex rel. Keystone Laundry & Dry Cleaners, Inc. v. McDonnell*, 426 S.W.2d 11, 13, 16–18 (Mo. 1968), this Court concluded a commercial laundry was not an "industrial plant" by refusing to conflate the meaning of the term "industrial" with the term "industry," as used in generalized references to the "sugar industry" or the "steel industry." While the term "industry" in those contexts "is used as a classification of a total line of business endeavor which includes plants, offices and all the accessories of a major element of our business world[, d]efinitions from that point of view are of little value here." *Id.* at 15–17. In other words, such generalized references do not make everything relating to a business endeavor into an "industrial plant." *Id.* Similarly, a generalized reference to the "avionics industry" does not make everything relating to a business endeavor into "industrial, maintenance and construction power equipment."

Moreover, construing "industrial" broadly to refer to any business activity would render the terms "construction" and "maintenance" meaningless. *See, e.g., 801 Skinker Blvd. Corp. v. Dir. of Revenue*, 395 S.W.3d 1, 5 (Mo. banc 2013); *see also* Matthew Davis, Note, *Statutory Interpre-tation in Missouri*, 81 Mo. L. Rev. 1127, 1136 (2016) ("Because each word of a statute is presumed to have been included for a particular purpose, an interpretation rendering statutory language redundant or without meaning is disfavored.").

Furthermore, if the phrase "power equipment" were read in isolation, it would, at a minimum, defeat the General Assembly's purpose of separately categorizing and defining the phrase "outdoor power equipment." *See Jackson*, 398 S.W.3d at 479. *Compare* §§ 407.850(5)(b) & 407.307.1(2), *with* §§ 407.850(5)(c) ("Outdoor power equipment used for lawn, garden, golf course, landscaping or grounds maintenance[.]") & 407.307.1(3). *See also* § 407.857, RSMo Supp. 2013 ("Retailers who sell and service **industrial, maintenance and construction power equipment or outdoor power equipment** as defined in section 407.850 ... shall be reimbursed by the manufacturer for the warranty work[.]") (emphasis added). Products not commonly considered to be "industrial, maintenance and construction power equipment"—such as hedge trimmers, weed trimmers, and lawn mowers distributed to the gardening industry— would qualify as such simply because the products use electricity or are used in a business activity. Indeed, such products are already covered under Chapter 407 as "outdoor power equipment." Such a broad construction of "industrial, maintenance and construction power equipment" would render the category of "outdoor power equipment" superfluous because "outdoor power equipment" would be subsumed by the phrase "industrial, maintenance and construction power equipment." *See, e.g., Skinker*, 395 S.W.3d at 5.

Accordingly, neither product at issue fits the definition of "industrial, maintenance and construction power equipment," as applicable in the IMCPE Act, section

407.753, and the Inventory Repurchase Act, section 407.860. The circuit court's judgment on Counts II and III is reversed.

## II.

■ L-3 argues the circuit court erred in entering judgment in favor of Sun on its fraudulent concealment claim because the circuit court "erroneously declared and/or misapplied the law" in determining L-3 had a duty to disclose its parent company's consolidation plans, which eventually led to the termination of the parties' business relationship.

■ "On review of a court-tried case, [this C]ourt will affirm the circuit court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Ivie v. Smith*, 439 S.W.3d 189, 198–99 (Mo. banc 2014). "Deference is paid to the [circuit] court's factual determinations, but this Court reviews *de novo* both the [circuit] court's legal conclusions and its application of law to the facts." *Zweig v. Metro. St. Louis Sewer Dist.*, 412 S.W.3d 223, 231 (Mo. banc 2013).

■ The issue is whether L-3 had a duty to disclose its parent's consolidation plans to Sun, which eventually led to the termination of the parties' business relationship. "Whether a duty exists is purely a question of law." *Hoffman v. Union Elec. Co.*, 176 S.W.3d 706, 708 (Mo. banc 2005). Whether a duty to disclose existed is determined on a case-by-case basis. *Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758, 765 (Mo. banc 2007). This Court in *Andes v. Albano*, 853 S.W.2d 936, 943 (Mo. banc 1993), explained:

> In some circumstances, it has been held that silence or nondisclosure of a material fact, when used as an inducement to another, can be an act of fraud. However-

er, before silence can amount to a representation upon which another party may rely, there must be a duty to speak. This duty arises either where there is a relation of trust and confidence between the parties or where one party has superior knowledge or information not within the fair and reasonable reach of the other party.

(Internal citations omitted). A "relation of trust and confidence" is essentially a fiduciary relationship. *See id.*; *see also State ex rel. PaineWebber, Inc. v. Voorhees*, 891 S.W.2d 126, 129 (Mo. banc 1995) (citing favorably Restatement (Second) of Contracts § 161(d) (1981)); *Fix v. Fix*, 847 S.W.2d 762, 765 (Mo. banc 1993); *Jones v. Arnold*, 359 Mo. 161, 221 S.W.2d 187, 193 (Mo. 1949); Restatement (Second) of Torts § 551(2)(a) (1977) (providing that a "party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated ... matters known to him that the other is entitled to know because of a **fiduciary or other similar relation of trust and confidence between them**") (emphasis added). The circuit concluded L-3 had a duty to disclose. It reasoned:

> It is undisputed that [L-3] did not tell [Sun] about the consolidation plan or any potential termination or non-renewal of Sun['s] franchise. This satisfies the element of a false representation, if [L-3] had a duty to disclose. Sun ... placed "trust and confidence" in [L-3]. Sun ... did not know of the consolidation plan and knowledge of it was not within Sun['s] reach. This is sufficient to establish a duty to disclose.

(Internal citation omitted). The circuit court's explanation of its conclusion demonstrates a misapplication of the law.

■ The circuit court's reference to "trust and confidence" came directly from

an exchange at trial between Sun's counsel and one of L-3's representatives:

Q: "Would it be fair to say that you had confidence and trust in Sun Aviation?"

A: "Yes."

Q: "To the best of your knowledge, would it be fair to say that they, that Sun Aviation had confidence and trust in you?"

A: "Yes."

But this mere acknowledgement of a mutual trust and confidence between the parties in an ordinary, arms-length business relationship, alone, is insufficient to give rise to the heightened duty to disclose a material fact that accompanies a fiduciary relationship. Indeed, the mere "existence of a business relationship does not give rise to a fiduciary relationship, nor [to] a presumption of such a relationship." *Kratky v. Musil*, 969 S.W.2d 371, 377 (Mo. App. W.D. 1998) (internal quotation marks and citation omitted); *see also id.* at 379 ("[T]he mere fact that the pair had long-time business dealings together does not establish ... that a confidential relationship existed."); *Lucas v. Enkvetchakul*, 812 S.W.2d 256, 261 (Mo. App. S.D. 1991) ("We do not find facts in this record that mandate a finding, as a matter of law, that the business relationship between the parties caused the plaintiff to be an agent of the defendants or that a confidential relationship existed between the parties. We decline to hold that the single statement by the plaintiff, 'I became the agent of Dr. Boon Mee and myself,' required a finding that a confidential relationship existed between these parties when that statement is viewed in light of the entire record."); *Kutz v. Cargill, Inc.*, 793 S.W.2d 622, 625 (Mo. App. E.D. 1990) (refusing to find that a confidential relationship existed between the parties because the parties merely established "a single, arms-length transaction").

▆▆▆ "Certainly, most contracts involve a degree of the factors indicative of reposed trust and confidence.... This ensures that common commercial dealings are not subject to heightened fiduciary responsibilities.... [P]arties may deal at arms length for mutual profit without subjecting themselves to heightened fiduciary duties." *Devery Implement Co. v. J.I. Case Co.*, 944 F.2d 724, 730 (10th Cir. 1991).

Nor did L-3 have knowledge—let alone "superior knowledge"—of its parent's decision to terminate Sun as a distributor as a result of the parent's consolidation plans. In *Hess*, this Court held a seller-bank of real estate property had a duty to disclose a material fact relating to that property to a purchaser *prior to the sale of that property*. 220 S.W.3d at 765–68. The bank, originally a mortgagee, foreclosed on the property after the mortgagor defaulted and was accused of illegally dumping large amounts of paint and paint-related products at the property. *Id.* at 763. The United States Environmental Protection Agency was informed of the illegal dumping, and thereafter opened an investigation into the matter. *Id.* at 763–64. After purchasing the property at the foreclosure sale, the bank received a communication from the agency regarding the investigation, which was still ongoing. *Id.* at 764. Despite this information, the bank listed the property for public sale, but did not disclose to the eventual purchaser of the property prior to the sale that there was an ongoing investigation into hazardous waste dumping on the property. *Id.* at 764, 766. The purchaser testified he "would not have offered to purchase the property had [he] known" it was under investigation. *Id.* at 764.

Unlike the bank in *Hess*, L-3 was not aware of its parent's decision to terminate Sun prior to the termination itself. L-3 had

no role in the consolidation process; it was "effectively imposed" on L-3 by its parent company. L-3 had no role in its parent's decision to terminate Sun as a distributor other than to "effectuate" its task of informing Sun of the termination due to its parent's decision. L-3 never recommended that Sun be terminated. L-3 did not "know how [Sun's termination even] came about[.]" Once L-3 was directed to terminate Sun, it executed that directive "relatively promptly[.]"

Accordingly, L-3 had no duty to disclose its parent's consolidation plan to Sun, which eventually led to the termination of the parties' business relationship. The circuit court's judgment on Count IV is reversed.

### III.

L-3 argues the circuit court erred in awarding 18 years of lost profits as damages on Count I because the circuit court "misapplied and/or erroneously declared the law" in that such damages for improper notice of termination under § 407.410.2 should have been limited to lost profits during the 90-day notice period contained in the Franchise Act, section 407.405.[6]

 This Court "will affirm the circuit court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Ivie*, 439 S.W.3d at 198–99. Furthermore, "[s]tatutory interpretation is an issue of law that this Court reviews de novo." *Newsome*, 520 S.W.3d at 780.

The Franchise Act, section 407.405, provides, in pertinent part, "[n]o person who has granted a franchise to another person shall cancel or otherwise terminate any

such franchise agreement without notifying such person of the cancellation, termination or failure to renew in writing at least ninety days in advance of the cancellation, termination or failure to renew[.]" Upon a finding of liability pursuant to the Franchise Act, section 407.405, section 407.410.2 provides the remedy:

> A franchisee suffering damage as a result of the failure to give notice as required of the cancellation or termination of a franchise, may institute legal proceedings under the provisions of sections 407.400 to 407.420 against the franchisor who cancelled or terminated his franchise in the circuit court for the circuit in which the franchisor or his agent resides or can be located. When the franchisee prevails in any such action in the circuit court, he may be awarded a recovery of damages sustained to include loss of goodwill, costs of the suit, and any equitable relief that the court deems proper.

The issue is whether "damages sustained" as a result of L-3's failure to give Sun the requisite 90 days' notice is limited to "damages sustained" during that 90-day period. The circuit court addressed this matter as follows:

> [L-3] claims any lost profit damages are limited to 90 days, because [it] could have lawfully terminated within 90 days. However, it has been over three years since the notice was served and [L-3] has not served a proper notice nor was there any evidence of any plan or intent to do so. The damages sustained are not limited to 90 days as [L-3] argues.

> The dollar amount of damages is a question of fact. The Court has found that Sun Aviation has sustained lost profit

---

**6.** L-3 does not challenge the circuit court's finding of liability under the Franchise Act, section 407.405.

damages of $7,600,659.00 caused by the wrongful termination. Damages for improper notice of termination are subsumed within and equal to that amount. The circuit court misapplied the law.

The plain language of § 407.410.2 connotes a causal connection between the particular statutory violation—"as a result of the failure to give notice"—and the injury—"damages sustained." *Parktown*, 278 S.W.3d at 672. This Court has refused to give § 407.410.2 "unintended breadth." In *Ridings v. Thoele, Inc.*, 739 S.W.2d 547, 548 (Mo. banc 1987), after a dispute arose between the parties, the franchise agreement was terminated without prior notice pursuant to the Franchise Act, section 407.405. A jury awarded the plaintiffs actual and punitive damages. This Court reversed the award of punitive damages, holding that such damages are not available under § 407.410.2 for a violation of the Franchise Act, section 407.405. *Ridings*, 739 S.W.2d at 548–49. This Court explained, in pertinent part:

> Further supporting this conclusion is the premise that statutory language, where possible, should be interpreted with internal consistency to avoid "unintended breadth". *Pollard v. Board of Police Comm'rs*, 665 S.W.2d 333, 341, n. 13 (Mo. banc 1984), *cert. denied*, 473 U.S. 907, 105 S.Ct. 3534, 87 L.Ed.2d 657 (1985). "[L]oss of goodwill, costs of the suit, and any equitable relief that the court deems proper" evince a compensa-

tory purpose, to make whole a plaintiff whose expectations have been frustrated. This remedial language does not, on the other hand, suggest an intent to punish or make example of a recalcitrant franchisor.

*Id.* at 549 n.4.

Pursuant to *Ridings*, an award of lost profits that exceed those caused by the failure to provide the 90-day notice would give "unintended breadth" to § 407.410.2. Damages under § 407.410.2 are limited to damages sustained due to reliance on the expectation that the relationship would continue for at least a 90-day period after notice of termination, and the costs of filing suit. Such damages are intended to compensate "a plaintiff whose expectations have been frustrated" due the failure to give the requisite notice. *Ridings*, 739 S.W.2d at 549 n.4. This limitation is further supported by the fact that a franchise may be lawfully terminated so long as the requisite notice is given pursuant to the Franchise Act, section 407.405, which could also result in lost profits after the 90 days.[7]

Accordingly, the phrase "damages sustained"—as used in § 407.410.2—as a result of L-3's failure to give Sun the requisite 90 days' notice is limited to "damages sustained" as a result of the failure to provide the 90-day notice. This Court vacates the damages award on Count I and remands for a new trial on damages. Rule 84.14.[8]

---

7. Further supporting this conclusion is the fact that the Franchise Act, section 407.405, unlike the IMCPE Act, section 407.753.2, contains no "good cause" requirement.

8. L-3's claim of reversible error in Points V and VI of its substitute brief is that the circuit court "misapplied and/or erroneously declared the law." However, in Point IV of its brief filed in the court of appeals, L-3 asserted two claims of reversible error: an unsupported-by-substantial-evidence claim and an

against-the-weight-of-the-evidence claim. Rule 83.08(b) provides, in pertinent part, that the "substitute brief shall conform with Rule 84.04" and "shall not alter the basis of any claim that was raised in the court of appeals brief[.]" Rule 84.04(d)(1)(B) requires that parties, in their points relied on, "[s]tate concisely the legal reasons for the appellant's claim of reversible error[.]" L-3 "alter[ed] the basis" of its claim of reversible error, and, accordingly, Points V and VI are not preserved for

## Conclusion

The circuit court's judgment is reversed in part, and remanded for a new trial on damages. In all other respects, the judgment is affirmed.

All concur.

review in this Court. *See, e.g., J.A.R. v. D.G.R.,* 426 S.W.3d 624, 629–30 (Mo. banc 2014).