**McBUD OF MISSOURI, INC., Plaintiff,**

v.

**SIEMENS ENERGY & AUTOMATION, INC., Defendant.**

No. 4:98–CV–645 CAS.

United States District Court, E.D. Missouri, Eastern Division.

Aug. 24, 1999.

Thomas Cummings, Michael F. Roche, Armstrong Teasdale, LLP, St. Louis, MO, for McBud of Missouri, Inc., plaintiff.

Thomas M. Dee, Mark A. Smith, Husch and Eppenberger, St. Louis, MO, for Siemens Energy & Automation, Inc., defendant. .

## *MEMORANDUM AND ORDER*

SHAW, District Judge.

Plaintiff McBud of Missouri, Inc. ("McBud" or "plaintiff") brings this diversity action for damages, alleging that defendant improperly terminated certain commercial distributorships in violation of the Missouri Power Equipment Act, R.S.Mo. §§ 407.750 *et seq.* (1994). The case is before the Court on defendant Siemens Energy & Automation, Inc.'s ("SE & A" or "defendant") motion for summary judgment. Plaintiff opposes the motion.

Defendant moves for summary judgment, asserting that the Power Equipment Act does not apply to this case because the statute's coverage is limited to "power equipment," and McBud did not distribute "power equipment" on its behalf. Defendant further contends that plaintiff did not also repair power equipment, as the statute requires. Plaintiff responds that it distributed and repaired "power equipment" within the meaning of the unambiguous terms of the statute, and even if the Court concludes the statute is ambiguous, a genuine issue of material fact exists as to whether the equipment it sold and repaired is "power equipment."

Resolution of the motion for summary judgment requires interpretation of the applicable Missouri statute, which is a matter of law, not of fact. *Staley v. Missouri Dir. of Revenue,* 623 S.W.2d 246, 248 (Mo. banc 1981). For the following reasons, the Court concludes the Power Equipment Act does not apply to the type of equipment McBud distributed for SE & A, and therefore SE & A's motion for summary judgment should be granted.

## I. *Standard of Review.*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In ruling on a motion for summary judgment, the court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts. *AgriStor Leasing v. Farrow,* 826 F.2d 732, 734 (8th Cir.1987). The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Fed.R.Civ.P. 56(c).

Once the moving party has met its burden, the non-moving party may not rest on the allegations of its pleadings but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. Fed.R.Civ.P. 56(e). *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505; *City of Mt. Pleasant v. Associated Elec. Coop., Inc.,* 838 F.2d 268, 273–74 (8th Cir. 1988). Rule 56(c) mandates "the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

With this standard in mind, the Court finds the following facts for purposes of the instant motion for summary judgment.

## II. *Facts.*

McBud is a distributor of items of equipment used in various applications to control and distribute electric power. The equipment intercepts electric power as it enters an end user's facility, and distributes and controls the power within the end user's facility. The equipment McBud distributes is typically used to distribute electrical power through a series of interrelated machines and equipment in order to allow the machines and equipment to work in a coordinated fashion. McBud refers to this equipment as "control components" and states the components are an integral part of many automation systems in industrial, construction and maintenance uses. McBud concedes that it never sold or repaired equipment that operates with its own power source (*i.e.*, an internal combustion engine) and uses that power to propel itself or do work.

In 1992, McBud entered into separate distributorship agreements with SE & A and Siemens Industrial Automation, Inc. ("SIA"). The SE & A agreement (Def.'s Ex. A) authorized McBud to distribute the following product lines under the "Distribution Equipment Components Module" and "Industrial Control Module":

> Molded Case Circuit Breakers for the MRO [maintenance repair operation] and construction markets, Enclosed Switches, Busway, Bus Plugs, Dry Type Distribution Transformers, Unassembled Panelboards with appropriate circuit breakers, Construction Market AC Control Products, Switchgear Parts, AC Control Products & Sensors, Molded Case Circuit Breakers for the Industrial OEM Market Drive Products, Motor Control Centers, Medium Voltage Control.

(Def.'s Ex. A, Attachments "B" and "D".)

The SIA agreement (Def.'s Ex. B) provided that McBud would distribute the following product lines:

SIMATIC S5 Programmable Controllers, Programmers, Software Products, and Peripherals directly related to SIMATIC S5, SINEC Networks and SIPART, ... SIMATIC TI Programmable Controllers, Software Products and Peripherals directly related to SIMATIC TI, TI505 series, TISTAR, APT, RTU, TFA, and CVU.... SIMATIC TI305 & TI405 Programmable Controllers, Software Products and Peripherals directly related.... SICOMP Industrial Computers and Man–Machine Interfaces.[1]

(Def.'s Ex. B, Modules "A"–"D".)

The distribution agreements make no reference to McBud repairing or offering repair service for any of the product lines it was authorized to sell. Plaintiff has submitted the affidavit of its president, Terry W. Koby, which avers that McBud sold and repaired equipment under the distribution agreements. For purposes of the instant motion, the Court accepts as true that McBud both sold and repaired equipment under the agreements. The Court also assumes that the subject equipment was used in industrial, construction or maintenance applications.

In October 1995, SIA merged into SE & A. As a result, SIA ceased to exist and the remaining corporation, defendant SE & A, continued manufacturing and selling the product lines of both SIA and SE & A. After the merger, no new distribution agreements were signed between SE & A and McBud.

On April 16, 1997, SE & A sent a letter to McBud, terminating McBud's distributorship agreements effective 90 days fro the date of the letter. (Def.'s Ex. C.) The SE & A letter does not specify a reason for the termination.

Thereafter, on April 15, 1998, McBud filed the instant action for damages, alleging that the distributorship agreements are subject to the provisions of the Mis-

---

1. The SIA agreement related largely to programmable logic control (PLC) units, which are electronic devices placed on a machine to cause the machine to do certain tasks at a certain speed or in a certain order, and related computer software developed by SIA.

souri Power Equipment Act, R.S.Mo. §§ 407.750 *et seq.*, and that SE & A improperly terminated the distributorship agreements. Plaintiff contends that defendant's termination of the agreements was improper and contrary to law because (i) no good cause existed to terminate the agreements as required by § 407.753.1; (ii) defendant failed to give plaintiff prior written notice of the termination, (iii) defendant's notice of termination did not include a statement of good cause for the termination, and (iv) the notice of termination failed to provide plaintiff the statutory sixty-day period in which to cure any claimed deficiency; all as required by § 407.753.2.

### III. *Discussion.*

#### A.

■ The issue presented in this case is whether the products sold and repaired by plaintiff under the distribution agreements are "industrial, maintenance [or] construction power equipment" within the meaning of the Power Equipment Act. Defendant moves for summary judgment on the basis that the product lines under the distribution agreements are not within the scope of the statute. Plaintiff responds that the product lines are covered by the statute. Both parties argue that the statute is unambiguous and its plain language supports their respective positions. The parties make additional arguments and offer further evidence, to be discussed *infra*, in the event the Court finds the statute ambiguous.

To resolve the issue, the Court turns to the language of the statute. By its terms, the Power Equipment Act applies to:

Any manufacturer, wholesaler or distributor of industrial, maintenance and construction power equipment used for industrial, maintenance and construction applications and repair parts therefor, who enters into a written or parol contract with any person, firm, or corporation engaged in the business of selling and repairing industrial, maintenance and construction power equipment used for industrial, maintenance and con-

struction applications and repair parts therefor, whereby such retailer agrees to maintain a stock of parts or complete or whole machines or attachments, shall not terminate, cancel, or fail to renew any such contract without good cause....

R.S.Mo. § 407.753.1.

■ The statute governs distributorships involving "power equipment" used in particular applications. The statute does not define "power equipment." In the absence of a statutory definition, words used in the statute are given their plain and ordinary meaning as derived from a dictionary. *Columbia Athletic Club v. Director of Revenue*, 961 S.W.2d 806, 809 (Mo. banc 1998) (citation omitted); *see Butler v. Mitchell–Hugeback, Inc.*, 895 S.W.2d 15, 19 (Mo. banc 1995). The purpose of statutory construction is to ascertain the intent of the legislature, and it is assumed the legislature did not intend a strained construction of the term "power equipment." *See Columbia*, 961 S.W.2d at 809. A statute must be given a reasonable construction, in accordance with the legislative objective, and should avoid absurd results. *David Ranken, Jr. Tech. Inst. v. Boykins*, 816 S.W.2d 189, 192 (Mo. banc 1991), *overruled on other grounds by Alumax Foils, Inc. v. City of St. Louis*, 939 S.W.2d 907 (Mo. banc 1997).

The parties did not cite and the Court was unable to find a dictionary definition of the term "power equipment." Plaintiff cites several dictionary definitions of "power," including "electricity supplied to a home, building, or community;.... Of or relating to the generation or transmission of electricity"; "to supply with electricity or other means of power.... Conducting electricity"; "Increase or decrease the power supplied to (a device); switch on or off"; "The capacity to supply physical systems, as machines, with the energy to operate or to generate light and heat." (*See* Pl.'s Mem.Opp. at 8). Plaintiff also cites the following definitions of "equipment": "The articles, implements, etc., used or

needed for a specific purpose or activity"; "Something material with which a person, organization or thing is equipped; especially, the tools, apparatus, or the like required for a particular job or purpose."

Plaintiff states that the equipment and components it distributed under the agreements were "typically used to distribute the electrical power throughout a series of interrelated machines and equipment in order to allow the machines and equipment to work in a coordinated fashion." (Pl.'s Mem.Opp. at 2.) Plaintiff asserts that under the broad definitions of the words "power" and "equipment" it has cited, the equipment and components it distributed are "power equipment" within the plain meaning of the statute.

In contrast, defendant argues that in common usage, the term "power equipment" refers to large machines such as cranes, backhoes and excavators with motors or engines. Defendant contends that the plain language of the statute restricts its coverage to machines which operate with their own power source, using that power to propel the machines or to do work. Defendant cites a number of dictionary definitions which contain the word "power" and also refer to various types of equipment, to support its contention that the term "power equipment" is a generic phrase meaning equipment with some form of engine or motor. These definitions include "powerboat: motorboat especially of substantial engine power"; "power duster: a motor-driven agricultural machine for spreading insecticidal dusts"; "power mower: a motor-driven lawn mower"; "power shovel: a power-operated shovel consisting of a boom or crane that supports a dipper handle with a dipper at the end of it and used principally for excavation and removal of debris." (See Def.'s Mem.Supp.Summ. J. at 5–6.) Defendant correctly states that plaintiff admits it did not sell or repair any equipment which operates under its own power, and defendant therefore asserts it is entitled to summary judgment.

The Court finds the various dictionary definitions offered by the parties to be of little assistance in interpreting the meaning of "power equipment" as used in the statute. Nonetheless, for purposes of the instant dispute, the scope of the statute is discernable without resort to extrinsic evidence. As quoted above, R.S.Mo. § 407.753 refers to "industrial, maintenance and construction power equipment used for industrial, maintenance and construction applications and repair parts therefor." Plaintiff asserts that it distributed and repaired programmable logic controller devices, control modules and related equipment. (See Pl.'s Resp. to Def.'s Statement of Uncontested Facts, ¶ 1.) Plaintiff describes the function of this subject equipment as working with and controlling various "end use" machines and equipment which perform work, by regulating, distributing and controlling electrical power used by the machines and equipment. (See Pl.'s Mem.Opp. at 4–5). Plaintiff does not contend that the subject equipment performs the work of "end use" machines, but rather that it regulates electricity, assists and controls "end use" machines in performing work. The subject equipment is therefore auxiliary and supplementary to other machines and equipment which perform "end use" tasks.

■ The Court finds it strains common sense to conclude that the Missouri legislature intended the term "power equipment" to include items of equipment or component parts which work in an auxiliary or supplementary manner with other machines or equipment. If plaintiff's contention were taken to its logical extreme, a distributor of electrical outlets or electrical wiring, whose products were utilized in an industrial, maintenance or construction setting, would fall within the scope of the statute because those are devices which can conduct power to enable machines to perform work. This would be an absurd result, and the Court does not read the statute to permit the construction urged by plaintiff. Rather, the language of the statute indicates that, at minimum, "power equipment" must refer to end use ma-

chines and equipment which operate and perform work using some power source, whether electrical, gas, steam, or other, or their own internal power source, such as an internal combustion engine. The subject equipment and components distributed by plaintiff do not meet this standard and therefore are not covered by the statute.

Having concluded that the subject equipment in this case is not covered by the statute, the Court need not determine whether the statute covers only equipment which operates with its own power source, as contended by defendant.

**B.**

■■ In the alternative, the Court concludes the language of the Power Equipment Act is ambiguous as to the type of products or distributorships intended to be covered by the terms "industrial, maintenance and construction power equipment," as it could be read differently by reasonably well-informed persons. *See State v. Haskins*, 950 S.W.2d 613, 616 (Mo.App. S.D.1997). Accordingly, the Court can look beyond the plain and ordinary meaning of the statute and employ canons of construction and examine extrinsic evidence to determine the legislative intent. *Id.* "Further insight into the legislature's object can be gained by identifying the problems sought to be remedied and the circumstances and conditions existing at the time of enactment." *Sermchief v. Gonzales*, 660 S.W.2d 683, 688 (Mo. banc 1983). Where a statute is ambiguous, courts have considered legislators' affidavits in order to determine legislative intent, where they are consistent with the statute and other legislative history. *See, e.g., Commerce Bank of Kansas City, N.A. v. Missouri Div. of Finance*, 762 S.W.2d 431, 434. (Mo.App. W.D.1988). Legisla-

tors' statements are not controlling, however, in determining legislative intent. *Id.; see also Gershman Inv. v. Duckett Creek Sewer Dist.*, 851 S.W.2d 765, 768 (Mo.App. E.D.1993).

In support of its motion, defendant submits the affidavits of former Missouri State Senator Jeff Schaeperkoetter, sponsor of Senate Bill 241 (1991), later adopted as the Power Equipment Act; Jeff Flora, Chief Executive Officer of the Western Retail Implement & Hardware Association (the "Association"), a trade association which spearheaded the effort to draft and pass the Power Equipment Act; Jack Selzer, an attorney for the Association, who was the primary author of the language used in the Power Equipment Act; and Jerry Parkin, Director of State Government Affairs for Deere & Co., who was involved in negotiations for the specific language that was to be included in the Power Equipment Act, and who has been directly involved in discussions and negotiations in other states regarding the wording of statutes similar to the Power Equipment Act. Defendant contends these affidavits establish that the legislature intended the Power Equipment Act to apply to large machines such as cranes, bulldozers, backhoes and the like.

Taken together, defendant's affidavits establish that prior to 1991, there were Missouri statutes addressing the rights of dealers of agricultural and lawn and grounds care equipment, upon the termination of contractual agreements under which the dealer maintained an inventory of the wholesaler or manufacturer's products and repair parts.[2] In 1991, the Association's board of directors passed a resolution to seek new legislation in Missouri to provide similar statutory rights for its members who were dealers of industrial, maintenance and construction equipment.[3]

---

2. *See* R.S.Mo. §§ 407.838, *et seq.* (1994) (concerning farm equipment dealerships), and R.S.Mo. §§ 407.890 *et seq.* (1994) (concerning outdoor power equipment).

3. The Association is one of twenty similar state and regional dealer associations affiliat-

ed with the North American Equipment Dealers Association ("NAEDA"). One purpose of these state and regional associations is to lobby for legislation protecting the rights of their dealer members in the areas they serve.

The Association's CEO, Mr. Flora, directed its general counsel, Mr. Selzer, to draft a bill for introduction in the Missouri Senate, which became Senate Bill 241.

Mr. Flora and Mr. Selzer aver that in their years of working with the Association, they came to understand the meaning of terms used in the industry by members of the Association and representatives of manufacturers such as Deere, Caterpillar, Case, New Holland and Vermeer. In drafting the Power Equipment Bill, Mr. Selzer selected terms which he believed to have a commonly understood meaning among the equipment dealers he represented and the manufacturers whose products the dealers sold and repaired.[4] Mr. Selzer and Mr. Flora aver that the terms "industrial power equipment," "maintenance power equipment" and "construction power equipment" have some overlapping meanings and are somewhat interchangeable. Mr. Selzer selected all three for use in the bill in order to include all the different kinds of power equipment manufactured by companies such as Deere, Caterpillar, Case, New Holland Vermeer (excluding their agricultural and lawn and grounds care equipment), and sold and repaired by Association members.[5]

Mr. Flora and Mr. Selzer intended and understood the term "power" as used in Senate Bill 241 to specify equipment which operates with its own power source, such as an internal combustion engine, and uses that power source to propel itself an/or to do work. Messrs. Flora and Selzer intended and understood the terms "industrial, maintenance and power equipment"

as used in Senate Bill 241 to specify machines such as crawler loaders, crawler dozers, dozers, motor graders, excavators, scrapers, four-wheel-drive loaders, backhoes, general purpose tractors, landscape loaders, grapple skidders, cable skidders, feller-bunchers, log loaders, delimbers, forklifts, material transport vehicles and trenchers.[6] The Association did not intend to include products such as those sold by SE & A within the terms of Senate Bill 241.

During the drafting process of Senate Bill 241, Messrs. Selzer, Flora and Dale Amick of the Association negotiated with Mr. Parkin of Deere; Don Defoe, a representative of Caterpillar; and Chris Wrigley, a representative of Associated Industries Missouri, a business lobbying group.

Mr. Parkin avers that he understood the term "power" as used in Senate Bill 241 to mean equipment which operates with its own power source, such as an internal combustion engine, and uses that power to propel itself and/or to do work. Mr. Parkin avers that in his years of working for Deere, he has come to understand the meaning of terms used in the industry by manufacturers like Deere, Caterpillar Corp. and J.I. Case, and their dealers, and the term "construction and industrial equipment" refers to the kind of off-road, self-propelled work machines that these manufacturers make. Mr. Parkin understood that the Power Equipment Bill was limited in scope to equipment that was sold and repaired by Association members who were dealers for companies like Deere, Caterpillar and Case. These three compa-

---

**4.** Of course, interpretation of the laws falls to the courts and not to trade association groups. A definitional section in the Power Equipment Act would certainly have assisted in making its purpose and scope more clear.

**5.** Plaintiff McBud is not and has never been a member of the Association.

**6.** Mr. Flora and Mr. Parkin aver that the Society of Automotive Engineers ("SAE") has identified several categories of "off-road self-propelled work machines" as "construction

and industrial equipment" in its SAE Recommended Practice, SAW J1116 JUN 86. *See* Def.'s Ex. R. Messrs. Flora and Parkin state that these SAE categories include many of the products that companies like Deere, et al. have for decades sold as "construction and industrial equipment," and that "the Association and its members identify as construction and industrial equipment." Further, the six categories of SAE J1116 for "Construction and Industrial Equipment" refer to "self-propelled" or "powered" machines or trucks.

nies do not, and did not in 1991, make products such as those sold by defendant SE & A as shown in Defendant's Exhibit I. Neither SE & A nor any manufacturer of products such as those shown Exhibit I, nor any dealer association or dealer selling such products, took part in the discussions and negotiations that led to the enactment of the Power Equipment Act.

Mr. Schaeperkoetter sponsored and introduced Senate Bill 241 in the Missouri Senate.[7] He negotiated primarily with Mr. Selzer and Mr. Amick, a lobbyist for the Association, concerning the scope and intent of and specific language to be used in Senate Bill 241. It was Mr. Schaeperkoetter's intent that the Power Equipment Act be limited in scope to large equipment used for industrial and construction purposes, and sold by distributors for manufacturers such as John Deere and Caterpillar. Mr. Schaeperkoetter understood the term "power equipment," as used in the Power Equipment Act, to mean large equipment that operates with its own power source, such as an internal combustion engine, and which uses that power to propel itself and/or to do work. Mr. Schaeperkoetter did not intend the term "power equipment" to refer to such products as electronic components, computers, appliances, or small electric tools.

Mr. Selzer testified before the Committee on Agriculture and Rural Business Development of the Missouri State Senate in support of Senate Bill 241. His testimony made clear that the specific equipment the Association intended to be covered by the bill was equipment made by manufacturers such as Deere, Caterpillar, Case, New Holland and Vermeer, and sold and repaired by Association members. The Missouri legislature made no changes in the terms Selzer used to describe the products covered by Senate Bill 241.

Defendant SE & A also contends that the Missouri Power Equipment Act is similar to laws in other states. In support, SE & A offers evidence that the National Association of Equipment Dealers of America publishes a Compilation of State Laws Relating to Equipment Dealers, a book with yearly updates, which sets forth the text or state statutes protecting the rights of the dealer members of its twenty constituent associations across the country. *See* Selzer Aff., ¶¶ 5–6; Flora Aff., ¶¶ 4–6. Defendant's Exhibit V consists of portions of the Compilation, including a listing of the dealer associations, an introduction, a Buy–Back and Dealer Protection Laws summary, a chart of the coverage of state statutes and a listing of the state statues. In the summary, NAEDA states:

> [T]he law may or may not cover farm equipment, utility and industrial equipment, and outdoor power equipment. Some state statutes include more than one type of equipment in one statute and others have separate statutes for industrial and utility equipment, outdoor power equipment and farm equipment.

*See* Def.'s Ex. V. The Compilation's chart of statutory coverage identifies the different types of equipment covered by each state statute, categorizing them as: construction, industrial, farm (which may include forestry), utility, outdoor power (lawn and garden) and heavy equipment.

Similarly, the Equipment Manufacturers Institute ("EMI"), which is composed of manufacturers of agricultural, construction, industrial and lawn and grounds care equipment, including Deere & Co., has also compiled a list of the manufacturer-dealer laws which affect its members in a Summary of State Manufacturer–Dealer Laws. Portions of the Summary are contained in Defendant's Ex. S. *See* Parkin Aff., ¶¶ 9–10.[8]

---

7. Mr. Schaeperkoetter previously had introduced the bills which became the laws concerning farm equipment dealerships and outdoor power equipment. Mr. Selzer had drafted those bills as well.

8. Defendant SE & A is not a member of EMI and was not a member in 1991.

In further support of its motion for summary judgment, defendant SE & A asserts that the definition of "power equipment" in statutes from three other jurisdictions is consistent with the definition it urges in this case. These statutes do not, however, concern dealer-manufacturer relationships, as does the statute at issue in this case.

In response, plaintiff McBud asserts that the affidavits submitted by SE & A are inconsistent with the Power Equipment Act, and therefore should be disregarded. Plaintiff contends the affidavits are inconsistent because the plain and ordinary meaning of the Act does not reflect the meanings and industry-specific purpose that is suggested by the affidavits, citing *Gershman* 851 S.W.2d at 768–69. Plaintiff makes no attempt, however, to contradict or rebut the affidavits filed by SE & A. Plaintiff also argues that the language of the three statutes from other jurisdictions is irrelevant to interpretation of the Missouri Power Equipment Act, because none of the statutes are comparable to the Act or have a comparable context in using the term "power equipment."

In support of its position that the term "power equipment" is broader than the "narrow definition" urged by defendant, plaintiff notes that an article in SE & A's Internet web site acknowledges that SE & A considers control components to be part of an automation system. Plaintiff cites the Academic American Encyclopedia which "states that among other components, electric power transmission systems include substations which contain 'circuit breakers and associated connection devices to switch equipment into and out of service, lightning arresters to protect the equipment, and other appurtenances for particular applications of electricity.'" Pl.'s Opp. at 14. Plaintiff also cites the Encarta Concise Encyclopedia, which states that equipment for safety and control is part of power systems.

Plaintiff submits the affidavit of Mike Christenberry, an officer of B & K Electric, a California distributor in the electrical distribution and equipment industry.

*See* Pl.'s Ex. I. Mr. Christenberry is familiar with the type of equipment sold by plaintiff, and believes the equipment is routinely utilized to distribute, regulate, generate, control and transmit power for primarily industrial, maintenance and construction applications. Accordingly, Mr. Christenberry believes that the subject equipment is accurate and appropriately described as industrial, maintenance and construction power equipment. Finally, plaintiff contends that the Internet web sites of three electrical equipment suppliers refer to controls, switchgear, industrial power circuit breakers and loadbreak switches as among the items considered to be "power equipment."

The Court concludes that the affidavits submitted by SE & A, from persons instrumental in the process by which the Power Equipment Act became law, are persuasive evidence of the statute's meaning. These affidavits establish that the Missouri legislature intended the term "power equipment" to mean large machinery which operates under its own source of power, such as an internal combustion engine, to propel itself and/or do work. The Court finds the affidavits are not inconsistent with the language of the Power Equipment Act. Rather, they serve to explain the purposes behind the Act and the meaning of the term "power equipment." As previously noted, plaintiff does not challenge the veracity of these affidavits. The fact that numerous other states have enacted statutes affecting equipment manufacturer-dealer relations also supports the industry-specific intent urged by defendant. The Court finds irrelevant, however, the definitions of "power equipment" in the three unrelated statutes from other jurisdictions.

The Court's interpretation of the term "power equipment" in the Act finds support in another portion of the Power Equipment Act. A familiar canon of statutory construction is that statutes are to be read in pari materia, *i.e.*, construed with reference to each other. *State ex inf.*

*Dankelson v. Holt,* 994 S.W.2d 90, 92 (Mo. App.S.D. 1999). R.S.Mo. § 407.750 provides that when an industrial, maintenance or construction power equipment distributorship is terminated, the retailer has the right to require the wholesaler, manufacturer or distributor to repurchase the retailer's inventory of "power equipment" and repair parts under certain terms and conditions. Exclusions from the repurchase requirement exist for, among other things, certain "implements, machinery, and attachments," R.S.Mo. § 407.750(7), (9); and for "any part that has been removed from an engine or short block or piece of equipment or any part that has been mounted or installed on an engine or on equipment." R.S.Mo. § 407.750(12). The use of the terms "implements, machinery and attachments" and the reference to engines and "short blocks" is consistent with the interpretation of the Act urged by defendant, but is nonsensical if the equipment sold and repaired by McBud were included within the definition of "power equipment."

The Court finds that the evidence plaintiff submitted in opposition to defendant's motion is unpersuasive. None of plaintiff's evidence is directly relevant to determining the Missouri legislature's intent in enacting the Power Equipment Act. Rather, plaintiff's evidence tends to show only that in other contexts, the type of equipment it sold and distributed has been or could theoretically be labeled "power equipment."

## IV. *Conclusion.*

For the foregoing reasons, the Court concludes that the equipment and components sold and repaired by plaintiff McBud under distributorship agreements with defendant SE & A are not "power equipment" within the scope of the language of the Missouri Power Equipment Act, R.S.Mo. §§ 407.750 *et seq.* As a result, defendant's motion for summary judgment should be granted.

Accordingly,

**IT IS HEREBY ORDERED** that defendant Siemens Energy & Automation, Inc.'s motion for summary judgment is **GRANTED.** [Doc. 21]

An appropriate judgment will accompany this memorandum and order.

### *JUDGMENT*

In accordance with the memorandum and order of this date and incorporated herein,

**IT IS HEREBY ORDERED** that defendant Siemens Energy & Automation, Inc.'s motion for summary judgment is **granted.**

**IT IS FURTHER ORDERED, ADJUDGED and DECREED** that judgment is entered in favor of defendant and against plaintiff McBud of Missouri, Inc., and that plaintiff's complaint is **DISMISSED.**

Costs are assessed against plaintiff.